IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |  | |
|---|---|---|---|
| NATIONWIDE AFFINITY INSURANCE COMPANY, | ) ) ) | | |
| Plaintiff and Counter-claim Defendant, | ) ) | | |
| vs. | ) ) | No. 5:17-CV-06012-DGK | |
| SCOTT LADEROUTE and PORTERS BUILDING CENTERS, INC., | ) ) ) ) | | |
| Defendants. | ) | | |

## ORDER GRANTING SUMMARY JUDGMENT

This declaratory judgment action concerns insurance coverage for a lawsuit filed by Defendant Porters Building Centers Inc. ("Porters") against Defendant Scott Laderoute ("Laderourte") in the United States District Court for the Western District of Missouri, Case No. 16-cf-6055 ("the underlying suit"). The underlying suit alleges Laderoute conspired with several of Porters' employees to steal proprietary information from Porters, and then used the information to solicit business for Laderoute's business, Sprint Lumber.

Plaintiff Nationwide Affinity Insurance Company ("Nationwide") provided Laderoute's home owner's insurance during the relevant time. Nationwide provided a defense in the underlying suit to Laderoute under a reservation of rights. It filed this lawsuit seeking a declaration that Laderoute is not entitled to coverage or indemnification in the underlying suit.

Now before the Court is Nationwide's Motion for Summary Judgment (Doc. 10). The Court GRANTS the motion because the "business pursuits" exclusion in Nationwide's policy denies coverage, and Laderoute's proffered affirmative defenses fail as a matter of law.

**Summary Judgment Standard**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party may resist summary judgment by asserting affirmative defenses, but it must support these defenses with specific facts. *Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co.*, 847 F.3d 594, 601 (8th Cir. 2017).

**Undisputed Facts**

The facts here are not in dispute.

**Chronology of Events**

Nationwide issued homeowners policy number HOA 0050277429 (the "Policy") to Laderoute. The Policy was in effect from December 17, 2015, to December 17, 2016.

On May 9, 2016, Porters filed the underlying suit against Laderoute. On August 10, 2016, Nationwide sent what it purports is a reservation of rights letter to Laderoute's attorney. Nationwide's six-page letter accurately summarized the allegations made in Porters' initial Petition as follows:

> The Complaint includes claims for (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (2) violation of the Sherman Antitrust Act, (3) computer tampering (4) violation of the Missouri Uniform Trade Secrets Act; (5) breach of restrictive covenants (6) breach of the duty of loyalty; (7) tortious interference with a business expectancy; (8) trespass; and (9) civil conspiracy.
>
> The Complaint alleges that former employees of Porters Building Centers, Inc. resigned to work for a competitor, Sprint Lumber. (Plf.s' Compl. ¶¶ 26, 27). The Complaint alleges that the former employees had planned to begin working for Spring Lumber months prior to resigning their positions at Porters. (Plf.'s Compl. ¶¶ 28). During these months the former employees were allegedly directly competing against Porters while employed with Porters. (Plf.'s Compl. ¶¶ 28).

In addition to naming the former employees as defendants, the suit also names your client as a defendant. The Complaint contains the following allegations against your client:

- Defendants solicited business of Porters' customers on behalf of Sprint Lumber. (Plf.'s Compl. ¶¶ 46, 54).

- Trespass by Defendant Downer, on behalf of Defendant Laderoute and Sprint Lumber, where Mr. Downer entered the Porters store located in Elwood, Kansas, and accessed a file cabinet containing customer files. (Plf.'s Compl. ¶ 56).

- Defendants attempted to form a monopoly that puts Porters out of business (Plf.'s Compl. ¶¶ 36–38, 40).

- Defendant Reynolds prepared and Defendant Downey sent Defendant Laderoute confidential information to Sprint Lumber about Porters' operations, including current employee salaries, rental costs, and business structure. (Plf.'s Compl. ¶ 39).

- Defendant Laderoute affirmatively pressed the former employees to bring their customers to Sprint Lumber. (Plf.'s Compl. ¶ 43, 44).

- Sprint Lumber agreed to set up Sprint e-mail accounts, cell phones, and business cards for the former employees. (Plf.'s Compl. ¶ 44).

- Defendants planned to copy Porters' protected trade secrets and confidential information. (Plf.'s Compl. ¶ 47).

- Defendant Downey sent Defendant Laderoute an email with detailed information about Porters' inventory, its delivery operation, and strategies for serving various localities. (Plf.'s Compl. ¶ 52).

- Defendants Sprint Lumber and Defendant Laderoute knowingly conspired with Defendant Downy and Higdon to access Porters' computers and mobile devices, delete Porters' proprietary information, and take Porters' proprietary information. (Plf.'s Compl. ¶ 84).

- Defendants disclosed and used Porters' trade secrets without consent and used trade secrets to compete against Porters. (Plf.'s Compl. ¶ 90).

- Defendants intentionally interfered with Porters' business expectancy by undercutting Porters' business and destroying Porters' information pertaining to its customers. (Plf.'s Compl. ¶ 110).

- Defendants coordinated and agreed to engage in a course of conduct in violation of statutory and common-law duties. (Plf.'s Compl. ¶121).

Letter at 4-5 (Doc. 11-4). After stating that the damages claimed in the underlying suit were not covered under the policy, the letter also identified "multiple applicable exclusions." *Id*. at 5. For example,

> First, the policy excludes from coverage any damages which arise out of or in connection with a "business" conducted by your client, Scott Laderoute. From the Complaint, it appears that all of the damages either arise out of or in connection with Sprint Lumber, which is owned by Mr. Laderoute. Accordingly, this exclusion bars coverage for such damages.

*Id*. at 5-6.

Nationwide began providing Laderoute with a defense after it received the initial Petition, and it is still providing him with a defense.

On October 3, 2016, Porters filed its Second Amended Petition ("the Amended Petition"). The Amended Petition was very similar to the initial Petition, but brought one less count. It alleged claims for violating the Computer Fraud and Abuse Act (Count I), Computer Tampering (Count II), violating the Missouri Uniform Trade Secrets Act (Count III), Breach of Restrictive Covenants (Count IV), Breach of the Duty of Loyalty (Count V), Tortious Interference with Business Expectancy (Count VI), and Civil Conspiracy (Count VII). It also

claimed damages of lost revenue, cost to replace and recover destroyed data, lost good-will, and damaged customer relationships.

On February 8, 2017, Nationwide filed this declaratory judgment action. On March 3, 2017, Laderoute filed his answer and a counterclaim alleging he is entitled to coverage under the Policy.

**The Policy**

The Policy is organized into different parts, with no index or table of contents. Each part is organized into different segments, and the different segments are organized in the fashion of an outline with different capital lettered sections, numbered subsections, and lower-case lettered sub-subsections. The Policy, including endorsements, is about fifty pages long.

The primary portion of the Policy is twenty-eight pages long. It consists of various sections, beginning with "AGREEMENT," and followed by "DEFINITIONS," "DEDUCTIBLE," "SECTION I – PROPERTY COVERAGES," "SECTION I – EXCLUSIONS," "SECTION I – CONDITIONS," "SECTION II – LIABILITY COVERAGES," "SECTION II – EXCLUSIONS," "SECTION II – ADDITIONAL COVERAGES," "SECTION II – CONDITIONS," and finally "SECTIONS I AND II – CONDITIONS." Following the primary portion of the Policy are approximately nine endorsements of various lengths.

The following Policy language is relevant to this dispute. The "DEFINITIONS" section of the Policy states:

> **B.** In addition, certain words and phrases are defined as follows:
>
> **2.** "Bodily Injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.
>
> **3.** "Business" means:

5

> **a.** A trade, profession or occupation engaged in on a full-time, part-time, or occasional basis; or
>
> **b.** *Any other activity engaged in for money or other compensation.*
>
> \* \* \*
>
> **8.** Under Section II "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:
>
> **a.** "Bodily injury"; or
>
> **b.** "Property damage".
>
> **9.** Under Section II, "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

Policy at 1-2, ECF at 5-6 (emphasis added).[1]

Twenty pages later, in the "SECTION II – EXCLUSIONS" portion of the Policy, it states:

> **E.** **COVERAGE E – Personal Liability and COVERAGE F – Medical Payments to Others**
>
> Coverages E and F do not apply to the following:
>
> **1.** **Expected or Intended Injury**
>
> "Bodily Injury" or "property damage" which is expected or intended by an "insured" even if the resulting "bodily injury" or "property damage";
>
> **a.** Is of a different kind, quality or degree than initially expected or intended; or

---

[1] Throughout this order, the first set of page numbers refers to the page numbers found in the lower-right hand corner of the Policy or endorsement, the second set of numbers refer to the page numbers automatically given to the page by the ECF system in ECF document 1-1.

        **b.**        Is sustained by a different person, entity, real or personal property, than initially expected or intended.

    **2.**    **"Business"**

        **a.**        "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

                This Exclusion **E.2.** applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

Policy at 21, ECF at 25. This section is followed by a section "F. COVERAGE E – Personal Liability" and a section "G. COVERAGE F – Medical Payments to Others".

    Most importantly, the Policy contains a four page endorsement titled "PREMIER HOMEOWNERS ENDORSEMENT." Above this caption, it states, "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READY IT CAREFULLY." Below the caption it states:

    **DEFINITIONS**

    The following definition is added:

    **14.**    "Personal injury" means injury arising out of one or more of the following offenses during the policy period:

        **a.**    false arrest, detention or imprisonment, or malicious prosecution;

        **b.**    libel, slander or defamation of character; or

        **c.**    invasion of privacy, wrongful eviction or wrongful entry.

                          \* \* \*

**SECTION II – LIABILITY COVERAGES**

    **A.**     **COVERAGE E – Personal Liability** is deleted and replaced by the following:

    **A.**     **COVERAGE E – Personal Liability**

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" or "personal injury" to which this coverage applies, we will:

    **1.**     Pay up to our limit of liability for the damages for which an "insured" is legally liable; and

    **2.**     Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false, or fraudulent. We may investigate an settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" has been exhausted by payment of a judgment or settlement.

\* \* \*

**SECTION II – EXCLUSIONS** in paragraphs **E.**,**F.**, and **G.** do not apply to "personal injury".

*"Personal injury" coverage does not apply to*:

\* \* \*

    **d.**     *injury arising out of the "business" pursuits of an "insured"*;

Premier Homeowners Endorsement at 1, 3-4, ECF 39, 41-42 (emphasis added).

## Discussion

**I.**     **Nationwide owes no duty to defend or indemnify Laderoute because the "business pursuits" exclusion applies to the injuries claimed in the underlying suit.**

Nationwide argues it is entitled to summary judgment for several reasons, the first being that the "business pursuits" exclusion in the Premier Homeowners endorsement denies coverage.

8

Because the Court agrees and this argument is dispositive, the Court will not address Nationwide's other arguments in favor of summary judgment.

### A. The "business pursuits" exclusion applies.

The underlying suit asserts a variety of economic and business tort claims. It seeks damages for lost revenue, cost to replace and recover destroyed data, lost good-will, and damaged customer relationships. These damages are plainly injuries arising out of Laderoute's business pursuits with Sprint Lumber, hence they are excluded under the Policy.

### B. The Policy is not ambiguous

Laderoute does not deny this exclusion exists; rather, he claims it is inconsistent with the clause preceding it, that is, the clause that reads "SECTION II—EXCLUSIONS in paragraphs E., F., and G. do not apply to 'personal injury'." Laderoute argues the policy is ambiguous because it grants coverage in one place and then takes it away in another. Laderoute also contends the endorsement uses the phrase "deleted and replaced by" in a confusing way and adds to the Policy's ambiguity.

Under Missouri law, an insurance contract is ambiguous "when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions." *Owners Ins. Co. v. Craig*, 514 S.W.3d 614, 617 (Mo. 2017). It is also ambiguous if "one section of an insurance policy promises coverage and another takes it away." *Id.* But Missouri law recognizes that, "[i]nsurance policies are read as a whole, and the risk insured against is made up of both the general insuring agreement as well as the exclusions and definitions." *Id.* And "[a]n insured cannot create an ambiguity by reading only a part of the policy and claiming that, read in isolation, that portion of the policy suggests a level of coverage greater than the policy actually provides when read as a whole." *Id.* A policy "must be construed as a whole and every clause

must be given some meaning if it is reasonably possible to do so." *Brugioni v. Maryland Cas. Co.*, 382 S.W. 707, 712 (Mo. 1964).

In construing the terms of an insurance policy, a court applies the meaning which an ordinary person of average understanding who is purchasing insurance would attach to the language, and resolves ambiguities in favor of the insured. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. 2010). Finally, Missouri law "strictly construes exclusionary clauses against the drafter, who also bears the burden of showing the exclusion applies." *Id.* at 510.

After carefully reading the entire Policy, the Court finds that an ordinary person shopping for insurance would understand that the Premier Homeowners Endorsement excluded personal liability coverage for the claims raised in the underlying lawsuit. Granted, the Policy could be written more clearly and organized in a way that is easier to follow, but it is still clear that the Premier Homeowners Endorsement changes the Policy by excluding personal liability coverage for acts taken while running a business such as the Sprint Lumber company. The Policy is not ambiguous; it cannot be reasonably read as extending personal liability coverage to business torts committed by Laderoute with the Sprint Lumber company.

## C. Nationwide did not waive this coverage defense.

Laderoute also claims that Nationwide is not entitled to summary judgment because it waived any coverage defenses. Laderoute suggests that whether a party's conduct can be construed as a waiver is question of fact. He contends the reservation of rights letter Nationwide sent him does not qualify as a reservation of rights letter under Missouri law because it did not clearly and unambiguously explain how the allegations in the initial Petition created coverage issues. Alternately, even if it was a valid reservation of rights letter, Nationwide waived any coverage defenses by not sending another reservation of rights letter after Porter filed the Amended Complaint.

These arguments are unavailing. As a threshold matter, a court may decide as a matter of law that a defense of waiver is not applicable, and so enter summary judgment. *See*, *e.g.*, *Safeco Ins. Co. of Am. v. Rogers*, 968 S.W.2d 256, 258 (Mo. App. 1998) (holding an insurer did not waive its coverage defenses under the policy by initially declining to provide coverage and then challenging coverage in a declaratory judgment action). And the record here shows Nationwide has not waived its defense that coverage is precluded by the "business pursuits" exclusion.

1. **The letter was a valid reservation of rights letter.**

A reservation of rights letter is a means by which, when coverage is in doubt, the insurer offers to defend the insured while reserving some or all of its policy defenses in case the insured is found liable. *City of Carter Lake v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052, 1060 (8th Cir. 1979). By notifying the insured of its reservation of rights prior to any determination of liability, the insurer suspends the operation of waiver and estoppel. *Id.* The purpose of a reservation of rights letter is to enable an insured to make an informed decision as to whether he should take some action in order to protect his interest, such as retaining an attorney, because of a possible conflict of interest between himself and his insurer. Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance Companies and Insureds § 2.14 (5th ed. 2011). If the insurer decides to defend the insured subject to a reservation of rights, the insured may elect to allow the insurer to defend him, or he may refuse to allow a defense under a reservation of rights, instead retaining his own attorney to defend himself and perhaps sue the insurer later. *Safeco Ins. Co. of Am.*, 968 S.W.2d at 258.

A typical reservation of rights letter does most, if not all, of the following: (1) identifies the policy at issue; (2) quotes, or at least refers to, the relevant policy provisions and identifies any terms, conditions, or exclusions which may bar coverage; (3) refers to specific, relevant allegations in the complaint; (4) identifies which claims may not be covered; (5) explains in

detail the basis for the insurer's coverage position; (6) sets forth the proposed arrangement for providing a defense and, depending on the law of the jurisdiction, advises the insured of its right to independent defense counsel; (7) advises the insured of any actual or potential conflicts of interest between the insurer and the insured; (8) reserves the right to withdraw from the defense; (9) contains a general reservation of rights, including the right to assert other defenses the insurer may subsequently learn to exist during further investigation; and (10) uses the words "reservation of rights." 1 Leo Martinez, Marc S. Mayerson & Douglas R. Richmond, <u>New Appleman Insurance Law Practice Guide</u> § 11.11[2][b] (2012); 14 Steven Plitt, Daniel Maldonado, Joshua D. Rogers & Jordan R. Plitt, <u>Couch on Insurance</u> § 202:47 (3d ed. 2013).

Nationwide's August 10, 2016, letter does all of these things. In particular, it clearly and unambiguously explains how the allegations in the underlying suit create coverage issues. It identifies the relevant Policy provisions, recounts the allegations in the underlying suit implicating these provisions, links these provision to the allegations with sufficient detail, and then states a clear conclusion. It states: "[T]he policy excludes from coverage any damages which arise out of or in connection with a 'business' . . . [I]t appears that all of the damages either arise out of or in connection with Sprint Lumber, which is owned by Mr. Laderoute. Accordingly, this exclusion bars coverage for such damages." This was sufficient to make a valid reservation of rights of the "business pursuits" exclusion.

**2. Nationwide did not have to send a second reservation of rights letter.**

Finally, Laderoute contends that by initially providing him with a defense under a reservation of rights, continuing that defense after Porters filed the Amended Petition without sending another reservation of rights letter, and then not filing this declaratory judgment action until February 8, 2017, a question of fact has somehow arisen concerning whether Nationwide impliedly waived its right to coverage defenses which prevents the entry of summary judgment.

12

This argument is without merit. As the nonmoving party, Laderoute may resist summary judgment by asserting an affirmative defense such as waiver, but he must support it with specific facts. *See Hiland Partners GP Holdings, LLC*, 847 F.3d at 601. Waiver is the intentional relinquishment of a known right. *Smith v. Maryland Casualty Co.*, 500 S.W.3d 244, 250 (Mo. App. 2015). And if a waiver is alleged to be *implied* from a party's conduct, "the conduct must clearly and unequivocally show a purpose to relinquish the right." *Brown v. State Farm Mut. Auto Ins. Co.*, 776 S.W.2d 384, 386-87 (Mo. 1989). The Court does not see how the facts identified above—providing a defense under a reservation of rights, continuing that defense after an amended petition is filed without sending an additional reservation of rights letter, and then filing a declaratory judgment action—support an inference that Nationwide impliedly waived its coverage defenses. Laderoute has not identified any analogous cases suggesting that it does,[2] nor can the Court find any. Consequently, the Court holds Laderoute has not identified facts capable of supporting an implied waiver affirmative defense, and Nationwide is entitled to summary judgment on its declaratory judgment claim.

---

[2] Laderoute has cited one case, *Smith v. Maryland Casualty Company*, 500 S.W.3d 244 (Mo. App. 2015), but that case does not support his position. *Smith* concerned two separate lawsuits. In the first lawsuit, the insurer defended the insured pursuant to a reservation of rights. 500 S.W.3d at 246. The trial court then dismissed the case for failure to prosecute. *Id*. at 247. The plaintiff later filed a second lawsuit. *Id.* The insurer did not send a second reservation of rights letter to the insured, but continued its defense as if it were a continuation of the same lawsuit. *Id*. The insured then entered an agreement with the plaintiff under Mo. Rev. Stat. § 537.065 and informed the insurer he would no longer accept a defense under a reservation of rights. *Id*. at 247-48. In the subsequent equitable garnishment action, the trial court granted summary judgment against the insurer, holding it had waived its coverage defenses because it had not notified the insured it was defending the *second lawsuit* under a reservation of rights. *Id*. at 248. The court of appeals, however, reversed, holding the plaintiff had not demonstrated it was entitled to judgment as a matter of law. *Id*. at 250. The Court does not see how *Smith* supports Laderoute's position.

## Conclusion

For the foregoing reasons, Nationwide's Motion for Summary Judgment (Doc. 10) is GRANTED. In light of this ruling, the Court also grants Nationwide summary judgment on Defendant Laderoute's counterclaim for declaratory judgment.

**IT IS SO ORDERED.**

Date:  December 7, 2017  /s/ Greg Kays
GREG KAYS, CHIEF JUDGE
UNITED STATES DISTRICT COURT